**STOUT et al. v. PRATT et al.**
No. 2780.

District Court, W. D. Missouri, W. D.
Dec. 21, 1935.

John G. Madden (of Madden, Freeman & Madden) and Alfred Kuraner, both of Kansas City, Mo., for complainants.

Charles Fahy, General Counsel, National Labor Relations Board, of Washington, D. C., for defendants.

OTIS, District Judge.

The complainants, Charles Stout, Warda Stout, and Alice Stout, are citizens of the United States and of the state of Tennessee. They own a little mill in the small city of Aurora in Missouri. In that mill flour is manufactured. Most of the wheat ground is grown in Missouri by Missouri farmers and purchased from them by the Stouts; some is grown in Kansas, there purchased, thence shipped to the mill in Aurora. Some of the flour manufactured is sold in Aurora and elsewhere in Missouri; some is shipped to states other than Missouri and there sold.[1]

Not long ago a majority of the employees in the mill at Aurora organized a union. They named it "Federal Labor Union No. 20,028." Some differences arose between complainants and the union touching wages and hours of labor, but the complainants voluntarily granted the demands of the union as to these matters. Soon the union made still other demands. It demanded a reduction in the hours of labor from six hours to five and one-half hours per day without reduction in wages. It demanded the right to select the foremen in the mill. It demanded the right to dictate the number of employees in each of the several operations in the mill. It demanded that complainants sign a contract agreeing to employ none except members of the union and to discharge no employee without cause, irrespective of complainants' need for his services.

The complainants could not comply with these demands and continue to compete with other mills and were forced temporarily to close their mill. The mill was closed August 20, 1935. Shortly thereafter, at the instance and request of the business men and city officials of Aurora, they agreed to endeavor to resume operation of the mill, and to that end they offered their former employees an increase in wages over the previous scale. The wages offered were satisfactory. The proposed hours of labor were satisfactory. But the union still demanded that the complainants sign the contract surrendering their rights to employ and discharge their employees as they chose.

It was then that complainants committed the "offense" on account of which the government of the United States proceeded against them. The "offense" was this:

---

[1] The bill alleges that 75 per cent. of the wheat and other grains ground in the mill are produced in Missouri, and that while some of the finished products of the mill are exported to other states, "no part thereof is during manufacture destined for any particular point of delivery or any particular purchaser."

They refused to execute the contract demanded by the union (to that extent refusing to bargain collectively with the representatives of a majority of their former employees), and they reopened the mill, re-employing all former employees who applied for employment, "dealing with said employees individually."

Such are the facts alleged in the bill and admitted by the defendants to be the facts by their motion to dismiss.

One of the defendants is the Regional Director of the National Labor Relations Board. The other defendants are the members of that Board.

On November 8, 1935, the National Labor Relations Board issued through the Regional Director a complaint against the Stouts charging them with "unfair labor practices" affecting commerce among the states, giving them five days to answer, and setting the matter for hearing on November 21. The only "unfair labor practice" set out in the complaint issued by the Board having any basis in the facts as alleged in the bill is that the complainants here refused to bargain collectively and did bargain individually with their employees.[2]

The bill prays injunctive relief against the prosecution of the Board's complaint.

The motion to dismiss the bill raises three questions: (1) Is the proceeding initiated against complainants authorized by the statute (National Labor Relations Act, 49 Stat. 449, c. 372, approved July 5, 1935 [29 U.S.C.A. § 151 et seq.])? (2) If the proceeding is authorized by the statute, is the statute, in so far as it authorizes the proceeding, constitutional? (3) If the statute is unconstitutional, do complainants have an adequate remedy at law for threatened injury on account of it so as to be precluded from relief in equity.

I. Proceeding Within Statute.

The first of these questions is answered easily. While the flour mill at Aurora is a small establishment where relatively few individuals are employed and is engaged exclusively in manufacturing, which, it is conceded, is a local business, yet the clear intent of the National Labor Relations Act is to subject the relations between employers and employees in even such small intrastate institutions to the control of the executive branch of the National Government.

The act creates the National Labor Relations Board (section 3 [29 U.S.C.A. § 3]) as an instrumentality to effect the prime object of the act. It then declares that certain practices by employers in their relations with employees (one of which is a refusal to bargain collectively with them) are unfair. Section 8 (29 U.S.C.A. § 158). It empowers the Board to prevent such unfair labor practices and prescribes the method for accomplishing that objective. Section 10 (29 U.S.C.A. § 160). It so clearly applies, and was intended to apply, to all employers and all employees in all industry, that it was thought necessary by Congress expressly to except from its provisions such employment as that of children by their parents and as that of domestic servants. Section 2 (3), 29 U.S.C.A. § 152 (3).[3] If a father

---

[2] The charges against complainants are thus set out in the complaint made by the Board (in which complainants here are referred to as respondents): "On August 20th and 29th, 1935, * * * Federal Labor Union No. 20,028 requested the respondents * * * to bargain collectively in respect to rates of pay, wages, hours of employment and other conditions of employment with Federal Labor Union No. 20,028 as the exclusive representative of all of the employees in said unit * * * the respondents did refuse and have refused to bargain collectively with Federal Labor Union No. 20,028 * * *. The respondents * * * did bargain individually with each employee * * * of said * * * plant with respect to rates of pay, wages and hours of employment * * *. The respondents * * * did state to a number of employees * * *

that the respondents would under no circumstances recognize, deal with or enter into an agreement with any labor organization affiliated with the American Federation of Labor, although respondents were aware that Federal Labor Union No. 20,028 was affiliated with the American Federation of Labor * * *. The respondents * * * did request and urge employees * * *; (a) to terminate their membership in said Federal Labor Union No. 20,028; (b) to induce and persuade other employees * * * to sever their affiliations with Federal Labor Union No. 20,028; and (c) to form a company union the membership of which would be limited to members of said * * * plant * * *."

[3] "It is a rule of construction, acknowledged by all," said Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1,190,

has three sons employed by him in a family enterprise, he still may bargain individually with each; he is not required to bargain only with the representatives of the majority.

There can be no doubt therefore that the defendants are right in believing that the flour mill at Aurora is within the act. Nor can there be any doubt that the "offense" charged against complainants is within the act, for the act expressly denounces refusal to bargain collectively with the representatives of the majority of employees with "respect to rates of pay, wages, hours of employment, or other conditions of employment." Sections 8 and 9 (29 U.S.C.A. §§ 158, 159). When the majority is organized, to bargain individually with any employee is condemned, at least impliedly. That intent, too, is made clear by express exceptions. Thus it is provided that "an employer shall not be prohibited from permitting employees to *confer* with him" (section 8 (2), 29 U.S.C.A. § 158 (2) and again that "any individual employee * * * shall have the right at any time *to present grievances* to (his) employer." Section 9 (a), 29 U.S.C.A. § 159 (a). The individual employee still can *confer,* still can *petition,* but he cannot *bargain.* If his employer bargains with him as an individual, as a man, as an American citizen, that is unfair; it is prohibited. The individual employee is dealt with by the act as an incompetent. The government must protect him even from himself. He is the ward of the United States to be cared for by his guardian even as if he were a member of an uncivilized tribe of Indians or a recently emancipated slave.

## II. Partial Invalidity of Act.

What the defendants have done and will do, unless enjoined, is then within the act. Our second question is: In so far as the act impliedly prohibits (by empowering the Board to prevent) a refusal by employers in such a flour mill as at that at Aurora to bargain collectively with their employees and prohibits individual bargaining, is it constitutional?

Unless it is authorized by the commerce clause of the Constitution (article 1, § 8, cl. 3), it is not constitutional.

That clause is: "The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

Under the commerce clause, in so far as we are here concerned with it, Congress has power to regulate one thing only; that is, "commerce among the several states." Nothing else can it regulate by virtue of this power.

It is inaccurate to say that under the commerce clause Congress can regulate that which, not itself a part of commerce among the states, directly affects that commerce. Because it may regulate commerce it may shield it, it may protect it, from that which would directly affect it by burdening or obstructing it. It is only when that outside thing actually impinges, or is about to impinge, on commerce that it can be reached by the power of Congress. The impingement may be prevented, for that is a regulation of commerce; but what goes on before and outside impingement or the threat of it is beyond the power. To illustrate: Congress may not regulate intrastate railway rates, but Congress may shield and protect interstate commerce from the direct effect of an attempted state regulation of such rates.

The word "direct" in the illustration, and the word "directly" in the familiar language, "that which directly affects commerce among the states," are indispensable and essential. The reason is that if the outside thing which is said to affect commerce does not "directly" affect it, that is, if it itself does not impinge on commerce, then it has not yet reached the field to which the power of Congress is confined by the very words of the Constitution.

Manufacturing is not commerce nor any part of commerce. Nothing more firmly is established in constitutional law than that. Congress, therefore, under the commerce power cannot regulate manufacturing. Hence it cannot regulate the relations between employers and employees in manufacturing, as commerce. Never can these relations be any part of commerce. Defendants admit that. Defendants say, however, that commerce may be affected by these relations.

6 L.Ed. 23, "that the exceptions from a power mark its extent." His reference was to the commerce power of Congress as vested by the Constitution. The rule of construction to which he referred equally is applicable, of course, to a statute.

But it is absurd to say that the refusal of the owner of a flour mill to bargain collectively with his employees *directly* affects commerce among the states. How does it affect it? Defendants answer (no other answer is conceivable): If the owner will not bargain collectively with his employees, the employees may strike; if the employees strike, production will be curtailed; if production is curtailed, less flour will be exported in commerce; and so commerce is lessened and thus affected.

It is difficult to imagine anything more remote from another and less *directly* connected with it than is the first step in this suggested chain of events from and with the last. The mere statement of this reasoning exposes its lack of reason. Elaborate exposition of its unsoundness involves an assumption I am not willing to make, that any individual can be found who seriously will maintain that interstate commerce *directly* is affected by the manner in which an employer bargains with his employees. To use the phrase employed in the Schechter Case (A. L. R. Schechter Poultry Corp. v. U. S.) 295 U.S. 495, 554, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, by Justice Cardozo, a more "distant repercussion" than is the suggested result of a lessened commerce from the faraway cause of a refusal of collective bargaining the wit of man cannot conceive.

Speculation as to what may have led to so distorted a view of the commerce power as is advanced in this case perhaps is valueless. Certain verbiage appearing in the act, particularly in section 1 setting out various "findings" and a "declaration of policy," suggests that phrases in Supreme Court opinions, and one or two decisions of that court, entirely irrelevant to the use now made of them, have been seized upon as foundation stones to support an argument for the asserted power.

#### "Stream of Commerce" Cases.

The Supreme Court has decided that Congress may regulate that which is in a "stream of commerce" or "current of commerce" or "flow of commerce among the states," even although the thing so regulated (if isolated) is an intrastate transaction. Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. That is because the thing so regulated (not being isolated but being in and an essential part of the stream or current or flow of commerce) is a *part* of commerce among the states. These phrases the defendants now lay before the court. They argue that if wheat is exported from Kansas to a Missouri mill and flour is exported from the Missouri mill to Iowa, that is a stream of commerce, and therefore that the business of the mill, including the relations of employers and employees therein, may be regulated by Congress.

The contention is untenable and may be disposed of in a paragraph. That is not a stream of commerce which begins in Kansas with the purchase of wheat in that state for transportation to a Missouri mill, which is interrupted by the delivery of the wheat at the Missouri mill where flour is manufactured from the wheat, and which ends in Iowa with the sale and delivery there of flour, a new product, a product different from the wheat which was shipped out of Kansas. Here are two distinct streams of commerce, one ending when the wheat is unloaded at the mill, the other beginning when the flour into which the wheat has been manufactured is loaded on cars for shipment to Iowa. The mill is at the end of one of these streams and at the beginning of the other, but it is a part of neither. In every opinion of the Supreme Court in which the phrase "stream of commerce" has been used, it has been used to describe a situation in which the thing moving in commerce, as cattle, as grain, has been the same at the beginning and at the end of the journey.

#### The Labor Decisions.

The decisions of the Supreme Court pointed to (Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; and other cases) do discuss the acts of employees in connection with the commerce power, but they lend no support what-

ever to the great amplification of congressional power urged here. The decision most relied on is that in Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963.

No more may be drawn from the Coronado Case than this: That Congress under the commerce power may prohibit acts of violence which shut off production by mines so as substantially to lessen interstate commerce in the products of such mines *when there is also an intention to so affect interstate commerce.*

There is no suggestion in the opinion in the case cited that Congress may legislate against any act merely because that act may lessen the production of goods designed for interstate commerce. Exactly the opposite was ruled. Id., 268 U.S. 295, loc.cit. 310, 45 S.Ct. 551, 69 L.Ed. 963. As exactly the opposite had been ruled in the first Coronado Case (United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762) and in earlier decisions. It was the element of intention to prevent interstate commerce added to the element of forcibly preventing production that brought the situation within the purview of the commerce power. And while it was ruled that the effect (lessened commerce from prevented production) was some evidence of intent, when considered with other facts showing intent, nevertheless intent was an essential element.[4]

Clearly this case gives no support to the contention that Congress can legislate to prohibit whatever lessens or prevents production unless, first, the thing prohibited does directly (not remotely, not indirectly) lessen or prevent production, and, second, unless the intent of him who does or would· do the thing prohibited is to prevent or lessen commerce. But refusal by an employer to bargain collectively with his employees cannot directly lessen or prevent production, and if it did do that, certainly it would constitute no evidence that the employer's intention was to lessen commerce.

If Congress can legislate to prevent that which indirectly and remotely or even directly and immediately might lessen the production of goods intended in whole or in part to be transported in interstate commerce after production, then its power is almost unlimited. If the relations between employers and employees may be regulated in one respect, they may be regulated in all respects. If such relations may be regulated by Congress to the end that production may not be lessened, certainly Congress also may legislate concerning the machinery in factories, for the less efficient the machinery the less the production by its use. And if Congress may legislate to prevent lessened production in mills and factories, it may do so also in agriculture and in every field of human activity.

Long ago (in Northern Securities Co. v. United States, 193 U.S. 197, 402, 24 S.Ct. 436, 468, 48 L.Ed. 679) that great jurist and patriot, Justice Holmes, said, when a much less expansion of the commerce power was urged than now is urged: "If the act before us is to be carried out according to what seems to be the logic of the argument for the government * * * I can see no part of the conduct of life with which, on similar principles, Congress might not interfere."

Very lately the great judge who now is Chief Justice of the United States said (A. L. R. Schechter Poultry Corp. v. U. S., 295 U.S. 495, loc.cit. 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947): "If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government."

There is now pending in Congress a resolution to amend the Constitution.[5] The first section of the proposed amendment is this: "The Congress shall have power by laws uniform in their geographical operation to regulate commerce, business, industry, finance, banking, insurance, manufactures, transportation, agriculture, and the production of natural resources." When that proposed amendment

[4] Of course, the intent to restrain or obstruct interstate commerce is not a necessary element when the acts done do directly and immediately restrain or obstruct commerce.

[5] H.J.Res. 323, introduced June 12, 1935, referred to the Committee on the Judiciary.

has been submitted and ratified the statute now under consideration, in the respects considered here, if then re-enacted, certainly will be constitutional. But not until then. Then also what yet remains of the sovereignty of the states will cease to be and the "citizen" will have become a "subject."

### III. Concerning the Remedy at Law.

The constitutional question just considered is fundamental in this case. It should be decided. It is not to be assumed that the defendants have any desire to enforce an unquestionable invalid provision in the act to the great harassment of business. They should not wish to postpone to some distant date the decision of the question. Moreover, I conceive it to be the duty of a district judge to give to the higher national courts which will review his judgment the benefit of his conclusions on all questions actually presented in any important case.

But there is another question in this case: Are complainants entitled to an injunction, upon the facts alleged in their bill, even if the statute relied on by defendants is invalid? This question, too, must be decided.

 There is an elementary principle that one may not have relief in equity against another to prevent threatened injury if he has an adequate remedy at law. These complainants are threatened with injury. A proceeding has been initiated against them on account of a course of action taken by them which was within their legal rights. When that proceeding has been carried through to its intended consummation in the manner provided in the act, they will be ordered to cease and desist from their entirely lawful course. That order will be made by one of the Circuit Courts of Appeals. If they disobey that order, they will be punished for contempt. Such is the final injury with which they are threatened. Meanwhile their business is interrupted; they are subjected to large and irrecoverable expenses; they are likely to be held up as objects of public ill will and scorn. What remedy does the law give them?

Outside of this act complainants have no remedy whatever, and it is not contended that they do have. If the act gives them a remedy that is not a remedy at law if the whole act is invalid, for if the whole act is invalid it is as if it had never been enacted (Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178) in any of its parts, including the part purporting to give a remedy. It is the contention of the complainants that the whole act is invalid. It is necessary therefore to consider this larger constitutional question.

It must be said at once that the very heart of the act is the single sentence in section 10 (29 U.S.C.A. § 160): "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158]) affecting commerce." Without that sentence all that precedes and all that follows it is meaningless. All else in the act is merely incidental to that.

The remainder of section 10, after the quoted sentence, prescribes the manner in which the Board is to prevent unfair labor practices affecting commerce. It includes a proceeding in a United States Circuit Court of Appeals. It is in connection with that proceeding, and only in that connection, that one complained against has any opportunity to assert the invalidity of the act or any of its provisions. Since, however, that part of section 10 prescribing procedure is obviously merely incidental to the provisions impliedly prohibiting specified unfair labor practices and expressly empowering the Board to prevent them, it must fall if that falls to which it is incidental. The question then is this: Is the heart of this act sound? Did Congress have the power to prohibit any of the specified unfair labor practices?

The specified unfair labor practices are set out in the margin.[6] Each of them

---

[6] Section 8. It shall be an unfair labor practice for an employer—

(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7. (Section 7 confers on employees the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection).

(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *

concerns the relations between employers and employees. As we have seen, the clear intent of the act is the prohibition of such unfair labor practices generally, in all industry. Congress did not intend that the act should have any limited application, as, for example, to those engaged, whether as employers or employees, in the business of interstate transportation of things or persons.

Now it needs no argument to establish the conclusion that Congress has no power generally to regulate the relations between employers and employees in industry. There is recognition of that fact in the act itself. The prohibition is only as to unfair labor practices "affecting commerce."

But, as I have endeavored to point out in part II of this opinion, Congress has no power to regulate that which merely "affects" commerce. It has the power to protect and shield commerce from that which directly affects it by burdening or obstructing it.

There is no way, and defendants point to none, in which any of the specified unfair labor practices in any business, whether mill or mine or factory or store, conceivably can directly affect, by burdening or obstructing, commerce. Here again the suggestion, the only suggestion, is that unfair labor practices will result in discontent, possibly in strikes, hence in limitation of production, hence in lessened commerce. But that is affecting commerce only indirectly, remotely.[7]

The conclusion is that the whole act is unconstitutional including that part of it which purports to give a remedy to those who may be injured by the enforcement of the act. Therefore, the complainants here have no remedy at law. Having no remedy at law, they are entitled to relief in equity.

The motion to dismiss the bill is denied. A temporary injunction, which complainants pray, will be granted. Specific findings of fact will be filed separately.

---

(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *;

(4) To discharge or otherwise discriminate against any employee because he has filed charges or given testimony under this chapter;

(5) To refuse to bargain collectively with the representatives of his employees. * * *" 29 U.S.C.A. § 158.

7 It is clear that the so-called "findings" in section 1 of the act (29 U.S.C.A. § 151), to the effect that unfair labor practices do affect commerce, mean nothing more than that they affect it thus indirectly and remotely.