BETHLEHEM SHIPBUILDING CORPORATION, Limited, v. MEYERS et al.

No. 4321.

District Court, D. Massachusetts.

July 22, 1936.

Claude R. Branch, Choate, Hall & Stewart, and John L. Hall, all of Boston, Mass., and Hoyt A. Moore, E. Fontaine Broun, and Cravath, de Gersdorff, Swaine & Wood, all of New York City, for plaintiff.

Robert B. Watts, of New York City, for defendants.

BREWSTER, District Judge.

In this suit the Bethlehem Shipbuilding Corporation, Limited, has asked for injunctive relief against threatened proceedings by the defendants, presuming to act by virtue of the Act of July 5, 1935 (chapter 372, 49 Stat. 449), 29 U.S.C.A. §§ 151–166, known as the National Labor Relations Act, hereinafter referred to as the act. The defendants have filed motions to dismiss the bill for lack of jurisdiction.

Plaintiff's prayer for temporary injunction was presented on the bill and affidavits, from which I made a finding that the facts alleged were proved, that plaintiff would suffer irreparable injury, and that I was not persuaded that the plaintiff's remedies at law were complete and adequate. I ordered a temporary injunction, reserving, however, the right to dissolve it if, after considering the arguments and authorities cited by counsel, I decided that the injunction had been improvidently granted. At the same time, I heard arguments on defendants' motion to dismiss. The disposition of this motion requires a summary of the facts alleged in the bill of complaint.

Commencement of proceedings by the defendants under the act, notice of hearing, and subpoenas served upon the plaintiff are alleged.

The plaintiff is a Delaware corporation, owning and operating a shipbuilding plant at Quincy, Mass., known as the Fore River Plant. This plant and its equipment are fully described in the bill. The plaintiff is engaged in the business of designing and building vessels of various kinds under specific contracts and employs approximately 5,000 employees. It fabricates substantially all materials used in the building of vessels, and for the most part builds boilers and main propelling machinery for each vessel. The vessels are delivered at the Fore River Plant. The cost of materials represents less than one-half the entire cost of the vessel.

A copy of the complaint issued by the National Labor Relations Board is attached to the bill of complaint, from which it appears that the plaintiff is charged by the Industrial Union of Marine & Shipbuilding Workers of America, Local No. 5, with indulging in practices declared unfair by the act, in that it seeks to dominate and interfere with an organization of plaintiff's employees, known and herein referred to as Employees' Plan of Representation.

The bill then sets forth in detail the consequences that will flow from the investigation instituted by the defendants. These may be summarized as follows:

That such proceedings will work harm to its reputation both with the public and with its employees; that they will inject strife into labor relations, now harmonious; that they will entail expense; that they will involve an unwarranted examination into the books, records, and affairs of the plaintiff, with the resultant disclosure of confidential information; that they will require attendance of employees

at hearings and generally disrupt and interfere with the plaintiff's business. It is further alleged that failure to comply with any order of the defendants will subject it to heavy penalties, imposed by the act, depriving the plaintiff of any opportunity to exercise its constitutional rights unless the court affords relief. It is also alleged that this investigation is a second attempt by the same labor organization to sustain charges of unfair practice against this plaintiff; that this earlier proceeding involved considerable loss of time, inconvenience, and a money outlay of over $15,000; that these proceedings were instituted by a board, organized under earlier statutes; and that, after hearing, the board denied the petition of the union and dismissed, as unfounded, the charges against the plaintiff.

The plaintiff asserts its right to maintain harmonious relations with its employees and to deal with them in respect of rates of pay, wages, hours of employment, and other working conditions in a manner mutually satisfactory to it and to its employees, and that such right is of incalculable value to the plaintiff in the successful conduct of its business at the Fore River Plant.

The bill then sets out with much detail the organization of the Employees' Plan of Representation and its operation since its organization in 1923, and shows that, as late as March, 1936, an election was held in which 91.9 per cent. of the employees participated, whereby the officers of the plant were elected without interference by the plaintiff.

It is alleged further that the relations existing between the plaintiff and its employees at said plant do not constitute interstate commerce; nor do they burden and obstruct such commerce. Finally, it sets forth nine specific grounds upon which the plaintiff claims that the act is unconstitutional, at least as applied to the situation existing in the Fore River Plant.

So far as the foregoing allegations are allegations of fact, they are admitted for the purposes of the motion to dismiss.

It is the defendants' contention that the court has no power to grant relief on these facts, regardless of the question of the constitutionality of the act. They cite numerous cases wherein equitable relief has been denied in proceedings somewhat similar, brought against the Labor Board or its agents. In some of these cases it is quite apparent that the court acted upon, or indulged, the presumption that the act was a valid enactment.[1]

In one case I find the court concurred in defendant's argument that the court was powerless to intervene if the act was unconstitutional.[2]

These cases I am unable to follow. Rather, I am in accord with those cases where temporary injunctions have issued against proceedings by the Board or its Representatives.[3]

It is to be noted that many of the cases cited by the defendants' attorney were decided before the decision had come down in the case of Carter v. Carter

[1] Precision Castings Co. v. Boland et al. (D.C.W.D.N.Y. March 6, 1936) 13 F. Supp. 877; Bemis Bro. Bag Co. v. Feidelson (D.C.) 13 F.Supp. 153; DuPont de Nemours & Co. v. Boland (D.C.W.D.N.Y., March 25, 1936)*. Blood & Co., Inc., v. Madden et al. (D.C.E.D.Pa., March 9, 1936) 15 F.Supp. 779; Joel et al. v. Rosseter et al. (D.C.N.D.Cal., April 14, 1936) 15 F.Supp. 914; Associated Press v. Herrick (D.C.S.D.N.Y., March 17, 1936) 13 F.Supp. 897; Alex Smith & Sons Carpet Co. v. Herrick (D.C.S.D.N.Y., May 6, 1936)*; see, also, National Labor Relations Board v. New England Transp. Co. (D.C.) 14 F. Supp. 497.

On facts presented, no irreparable injury shown, but motion to dismiss denied. Bethlehem Shipbuilding Corp., Ltd., v.

Nylander (D.C.S.D.Cal. April 3, 1936) 14 F.Supp. 201.

[2] S. Buchsbaum & Co. v. Beman (D.C. N.D.Ill., April 15, 1936) 14 F.Supp. 444; contra Bendix Products Corp. v. Beman (D.C.N.D.Ill., March 24, 1936) 14 F. Supp. 58.

[3] Vernor Co. v. Bowen, E.D.Mich., Dec. 14, 1935 [no opinion filed]; Stout et al. v. Pratt (D.C.) 12 F.Supp. 864; Infants Socks, Inc., v. Clark et al. (D.C.E.D.Wis., Feb. 1, 1936) [1]; Lindemann & Hoverson v. Clark et al. (D.C.E.D.Wis., Feb. 1, 1936) [1]; Marathon Electric Co. v. Clark et al. (D.C.E.D.Wis., Feb. 1, 1936) [1]; J. I. Case Co. v. Clark et al. (D.C.E.D.Wis., April 11, 1936) [1]; Iowa Mfg. Co. v. Beman (D.C.N.D.Iowa, Feb. 2, 1936)*; El Paso Elec. Co. v. Elliott et al. (D.C.W.D. Texas, June 10, 1936) 15 F.Supp. 81.

*No opinion for publication.

Coal Co., 56 S.Ct. 855, 863, 80 L.Ed. —— (decided by the Supreme Court May 18, 1936). There were a number of cases cited arising in the District of Columbia in which the Supreme Court refused relief.[4]

■ Since the Carter Case, and on the authority of it, the United States Court of Appeals for the District of Columbia has granted injunctions in these cases and others against the Labor Board, now pending before that court. So far as the authorities cited sustain the proposition that a plaintiff who questions the constitutionality of the statute cannot invoke the powers of an equity court for the sole purpose of testing the validity of the act, I am in accord.

■ But I cannot agree that the court is without power to prevent the execution of a void statute when proceedings under it will involve loss, injury, and expense which cannot be restored, satisfied or compensated. In Poindexter v. Greenhow, 114 U.S. 270, 5 S.Ct. 903, 914, 962, 29 L.Ed. 185, the court notes the distinction between the sovereignty and the government of it and stresses the point that when the government acts within the sphere of its agency it is a perfect representative "but outside of that, it is a lawless usurpation." The defendants' argument comes to this, that a court convinced that the threatened acts of the defendants will constitute "lawless usurpation" must stand aside and permit the usurpation to proceed to an order of the Labor Board which the court ultimately must declare null and void. I am not yet ready to concede that the equity powers of this court are thus limited.

■ Assuming for the moment that the act is declared unconstitutional, the defendants then, without any authority or warrant of law, will attempt an investigation into the affairs of the plaintiff and the organization of its employees, subpœnaing employees as witnesses, examining books and records, disrupting the work at the plaintiff's plant, creating uncertainty, apprehension, and unrest among the employees. These are alleged as unavoidable results of the interference by government agencies, if the investigation is allowed to proceed to a conclusion. There can be no doubt that, to some extent, expenses will have been incurred, loss will have been sustained, and damage will have been done by this illegal invasion of the plaintiff's rights. The danger threatened is immediate and great. No one can foresee the extent of the consequences that will follow, but whatever they may be, they will be irreparable since the law can give no redress. The equity court has jurisdiction to interpose its power to prevent a threatened invasion of the property rights of the plaintiff. Rickert Rice Mills, Inc., v. Fontenot, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513; Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016; Stout v. Pratt (D.C.) 12 F.Supp. 864; Bendix Products Corp. v. Beman et al. (D.C.) 14 F.Supp. 58.

It is no answer that the act provides for judicial review. The remedies of the act fall with the other provisions of the act, if it be held unconstitutional in toto. In any event, plaintiff is left with no adequate or complete remedy at law. El Paso Electric Co. v. Elliott et al. (D. C.W.D.Texas, June 10, 1936) 15 F.Supp. 81; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Bendix Products Corp. v. Beman, supra.

I am influenced somewhat by the fact that the proposed investigation was not started in response to any request by plaintiff's employees, or by a labor organization with which its employees are affiliated. No harm can come from staying the proceedings under the act until it has been finally determined that the defendants are not unlawfully trespassing upon the rights of the plaintiff.

As was said in Denver & R. G. R. Co. v. United States (C.C.A.) 124 F. 156, 161:

"The case falls well within the established rule that a preliminary injunction maintaining the status quo may properly issue whenever the questions of law or of fact to be ultimately determined are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party

---

[4] Heller Bros. Co. v. Lind, Eq. 60, 593; Lawrence Leather Co. v. Madden, Eq. 60, 611; Brown Shoe Co., Inc., v. Madden, Eq. 60, 650; Beaver Mills v. Madden, Eq. 60, 507; Echols v. Madden, Eq. 60, 267.

*No opinion for publication.

[1] No opinion filed.

will be comparatively small if it is granted."

Were the balance of the equity otherwise, the court would not be powerless to act.

In Nashville, C. & St. L. R. Co. v. McConnell (C.C.) 82 F. 65, 70, a preliminary injunction was granted, and during the course of the opinion the court observed:

"Indeed, as has been, in substance, said in other cases, the very fact that a right has been violated, and that this violation is constantly going on, and that a court of law cannot, in damages, compensate the injury or stop the wrong, furnishes the best possible reason for interference by court of equity; and the fact that an actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction large, is not to weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated, and on the other a wrong committed."

■ Nevertheless, the preventive powers in equity in these cases ought not to be exerted so as to interfere with the duties of those charged with executing a statute, if the court is in doubt respecting the authority of such agencies. For that reason I deem it necessary to examine the law and the adjudications of the Supreme Court in order to determine if any such doubt is justified.

The Labor Act has been declared unconstitutional, as applied to the employer-employee relation existing in the manufacturing industry. Stout v. Pratt, supra; Bendix Products Corp. v. Beman, supra; National Labor Relations Board v. Jones & Laughlin Steel Corp. (C.C. A.5 June 15, 1936) 83 F.(2d) 998; Fruehauf Trailer Co. v. National L. R. Board (C.C.A.6 June 30, 1936) 85 F.(2d) 391.

In view of the recent decisions of the Supreme Court rendered in the case of Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Carter v. Carter Coal Co., supra, there can be little doubt that the provisions and purposes of the act lie outside the limits of the grant to the central government. It must be conceded that the act purports to be an exercise of the power of Congress to regulate commerce between the states.

■ In an attempt to bring it within the ambit of the Commerce Clause (article 1, § 8, Cl. 3), there have been incorporated in the act declaration of policy and congressional findings. These findings and policies are set forth in the first section of the act (29 U.S.C.A. § 151). In substance, so far as material to the present inquiry, it is said that:

"The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce."

It is further found that the inequality of bargaining powers between employees and employers tends to depress the purchasing power of wage-earners in industry and thereby substantially burdens and affects the flow of commerce.

If this declaration of purpose and congressional findings were to control, the result would be to extend the commerce powers to all manufacturing activities whenever the raw material is imported or the finished product exported from the state where the manufacturing takes place. That the power of Congress over interstate commerce may not be thus extended is no longer open to debate. In the Agricultural Adjustment Act (Act of May 12, 1933, c. 25, 48 Stat. 31, see 7 U.S. C.A. § 601 et seq.), there was a declaration that the reduced purchasing power of farmers had burdened and obstructed the normal current of commerce. When the act came before the Supreme Court to test its constitutionality, it was observed in the opinion that the government did not attempt to uphold the va-

920

lidity of the act upon the basis of the Commerce Clause. United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

Again, in the National Industrial Recovery Act (Act of June 16, 1933, § 1, 15 U.S.C.A. § 701) Congress declared it to be its policy to "remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof" and to "maintain united action of labor and management under adequate governmental sanctions and supervision" and to "improve standards of labor, and otherwise to rehabilitate industry."

A code of fair competition, set up under the act to effectuate the declared purpose, contained provisions relative to wages and the hours of employees employed in slaughter houses of a poultry dealer. The constitutionality of the act, upon which this code was based, came before the court in Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

Referring to the labor provisions and their effect upon interstate commerce, the court held that they did not directly affect such commerce so as to subject these relations to federal regulations.

The distinction between direct and indirect effect of intrastate transactions upon interstate commerce, and the importance of it in determining constitutionality of legislation, were clearly pointed out and the authorities reviewed in the unanimous opinion of the court in that case.

Finally, we have the more recent case of Carter v. Carter Coal Company, supra, which brought to the court the so-called Bituminous Coal Conservation Act of 1935 (15 U.S.C.A. §§ 801–827), the purpose of which, as declared by the title, was not only to stabilize the bituminous coal industry and thereby remove obstructions of interstate commerce, but declared that the right of mine workers to organize and collectively bargain for wages, hours of labor, and conditions of employment, should be guaranteed in order to prevent wage cutting and disparate labor costs detrimental to fair interstate commerce, and, further, to avoid obstructions of interstate commerce that recur in industrial disputes over labor relations at the mine.

The act contained provisions relating to labor. A Labor Board was created,

upon which authority was conferred to adjudicate labor disputes and to determine whether an organization of employees was controlled or dominated by the employer; and subdivision (g) of part 3 of section 4 (15 U.S.C.A. § 808 (g) provided in substance that when the representatives of more than half of the mine workers employed had agreed on the maximum hours of labor, such agreement was binding upon all the code members.

So far as respects the policy of Congress to seek to prevent strikes and labor disputes with its effect upon interstate commerce, the Bituminous Coal Conservation Act of 1935 does not substantially differ from the declared policy in the National Labor Relations Act.

Referring to these declarations, the court said, in the Carter Case:

"Certain recitals contained in the act plainly suggest that its makers were of opinion that its constitutionality could be sustained under some general federal power, thought to exist, apart from the specific grants of the Constitution. The fallacy of that view will be apparent when we recall fundamental principles which, although hitherto often expressed in varying forms of words, will bear repetition whenever their accuracy seems to be challenged."

These recitals were said to be merely a preamble to the act and did not constitute an exertion of the will of Congress, but a recital of considerations which "in the opinion of that body existed and justified the expression of its will in the present act."

It was also said that the declaration that the conditions described directly affected interstate commerce was a pure assumption.

After reviewing at some length the previous decisions of the court with the view of defining anew the limitations upon the commerce powers of the federal government, the court reached the question upon which, in my opinion, the constitutionality of the National Labor Relations Act must turn. In the course of the opinion, it is said:

"One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has engaged in two distinct and separate activities. So far as

he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In respect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. Utah Power & L. Co. v. Pfost, 286 U.S. 165, 182, 52 S.Ct. 548, 76 L.Ed. 1038. Production is not commerce; but a step in preparation for commerce. Chassaniol v. Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004.

"We have seen that the word 'commerce' is the equivalent of the phrase 'intercourse for the purposes of trade.' Plainly, the incidents leading up to and culminating in the mining of coal do not constitute such intercourse. The employment of men, the fixing of their wages, hours of labor, and working conditions, the bargaining in respect of these things —whether carried on separately or collectively—each and all constitute intercourse for the purposes of production, not of trade. The latter is a thing apart from the relation of employer and employee, which in all producing occupations is purely local in character. * * *

"A consideration of the foregoing, and of many cases which might be added to those already cited, renders inescapable the conclusion that the effect of the labor provisions of the act, including those in respect of minimum wages, wage agreements, collective bargaining, and the Labor Board and its powers, primarily falls upon production and not upon commerce; and confirms the further resulting conclusion that production is a purely local activity. It follows that none of these essential antecedents of production constitutes a transaction in or forms any part of interstate commerce. Schechter Corp. v. United States, supra, 295 U.S. 495, at page 542 et seq., 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Everything which moves in interstate commerce has had a local origin. Without local production somewhere, interstate commerce, as now carried on, would practically disappear. Nevertheless, the local character of mining, of manufacturing, and of crop growing is a fact, and remains a fact, whatever may be done with the products."

Again, to quote from the opinion:

"Much stress is put upon the evils which come from the struggle between employers and employees over the matter of wages, working conditions, the right of collective bargaining, etc., and the resulting strikes, curtailment, and irregularity of production and effect on prices; and it is insisted that interstate commerce is *greatly* affected thereby. But, in addition to what has just been said, the conclusive answer is that the evils are all local evils over which the federal government has no legislative control. The relation of employer and employee is a local relation. At common law, it is one of the domestic relations. The wages are paid for the doing of local work. Working conditions are obviously local conditions. The employees are not engaged in or about commerce, but exclusively in producing a commodity. And the controversies and evils, which it is the object of the act to regulate and minimize, are local controversies and evils affecting local work undertaken to accomplish that local result. Such effect as they may have upon commerce, however extensive it may be, is secondary and indirect. An increase in the greatness of the effect adds to its importance. It does not alter its character."

It is obvious, from the terms of the act, that it was not the intention of Congress to limit the authority of the Labor Board to deal with employer-employee relations of those actually engaged in operating instruments of interstate commerce, but rather to extend that authority to those engaged in the production by manufacture or otherwise. This is clearly shown from the preamble, and also from definitions of the term "employee" and the term "affecting commerce" appearing in section 2 of the act (29 U.S.C.A. § 152). The term "employee" included all employees except agricultural laborers and domestic servants or an individual employed by his parent; and the term "affecting commerce" means in commerce or burdening or obstructing commerce or the free flow of commerce or having led, or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

The legislation is based upon some theory that the relationship between a manufacturer and his employees is caught in the current of interstate commerce, or

that a disturbance of such relationship will affect the free flow of commerce.

The result of the recent cases considered is to compel this court to dismiss such a theory as an adequate basis for extending the commerce powers to the regulation of plaintiff's labor situation. That has been definitely placed by these decisions beyond the regulatory power of the federal government.

It is argued that the act finds support in cases like Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 402, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839, in which legislation regulating local activities was upheld, but, as was pointed out in the Carter Case, these cases rested "upon the circumstance that the acts in question constituted direct interferences with the 'flow' of commerce among the states." Carter v. Carter Coal Co., supra, 56 S.Ct. 855, 80 L.Ed.

The situation presented in these cases involves focal points through which the stream of commerce passed from producer to consumer without changing the character or identity of the commodity. Thus, in the Stafford Case, the court said:

"The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East, and from one state to another. Such transactions cannot be separated from the movement to which they contribute and necessarily take on its character."

Compare Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517.

Defendants also rely upon cases arising under anti-trust laws, such as Coronado Coal Co. v. United Mine Workers of America, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Company v. Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Local 167, International Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804.

These cases were held inapposite in the Carter Case, and it is not necessary to repeat here the grounds of distinc-

tion assigned by the court in that case. Because the Supreme Court upheld the Railway Labor Act of 1926 in Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, it is argued that the National Labor Relations Act of 1935 should be sustained. It is not difficult, however, to see that a strike among employees of an interstate carrier would have a direct effect upon interstate commerce, if it resulted in an interruption of service. The real question involved in that case was whether the lower court had properly exercised its power to punish for contempt a railroad which had refused to comply with its decree. It is to be noted that, during the course of the opinion in that case, the court, in dealing with the power to regulate commerce, said that the power to regulate commerce was the power to enact all appropriate legislation for its protection and advancement, and that, in exercising this authority, the government had power to facilitate the amicable settlement of disputes which threatened the service of *necessary agencies of interstate transportation.* (Italics supplied.) A strike in the plaintiff's plant, of course, would not involve the service of a "necessary agency of interstate commerce."

Decisions have been handed down over a considerable period of time which are wholly consistent with the view that such direct effect would not flow from a labor disturbance between a manufacturer and his employees. Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325; Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290; Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724; United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237; United Leather Workers' International Union v. Herkert, etc., Co., 265 U.S. 457, 44 S.Ct. 623, 624, 68 L.Ed. 1104, 33 A.L.R. 566.

The case last cited affords a good illustration of the application of the rule to a labor dispute. In that case an employer sought to enjoin an organization of employees from illegal picketing and other interference with the employer's

 

manufacturing and interstate business and with its employees, or would-be employees, engaged in carrying it on. These acts of the employees were charged to be in violation of the anti-trust laws by unduly restraining interstate commerce. In denying equitable relief to the employer, Chief Justice Taft made this statement:

"The sole question here is whether a strike against manufacturers by their employees, intended by the strikers to prevent, through illegal picketing and intimidation, continued manufacture, and having such effect, was a conspiracy to restrain interstate commerce under the Anti-Trust Act, because such products when made were, to the knowledge of the strikers, to be shipped in interstate commerce to fill orders given and accepted by would-be purchasers in other states, in the absence of evidence that the strikers interfered or attempted to interfere with the free transport and delivery of the products when manufactured from the factories to their destination in other states, or with their sale in those states."

After reviewing the decisions pertinent to that inquiry, the court came to the conclusion that the acts of the defendant employees in that case did not directly interfere with interstate commerce; the court observing:

"The record is entirely without evidence or circumstances to show that the defendants in their conspiracy to deprive the complainants of their workers were thus directing their scheme against interstate commerce. It is true that they were, in this labor controversy, hoping that the loss of business in selling goods would furnish a motive to the complainants to yield to demands in respect to the terms of employment; but they did nothing which in any way directly interfered with the interstate transportation or sales of the complainants' product."

Whether the act is unconstitutional in toto, or whether the regulatory powers conferred by the act may be exerted within a limited field, are questions which do not necessarily call for decision in the instant case. If the act is to be construed so as to extend these powers to plaintiff, it clearly is beyond the power of Congress. On the allegations of the bill the board or its representative have no authority in the premises, and Congress is not endowed with power to confer such authority. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; Fruehauf Trailer Co. v. National Labor Relations Board, supra.

I agree with the United States attorney that the members of the Labor Board in their official capacity are not before the court in these proceedings. New England Transp. Co. v. Myers (D.C.Mass. March 29, 1936) 15 F.Supp. 807. I treat the proceedings as against individuals, who have been duly served with process, who are threatening to act under color of a statute which is invalid. I have no doubt respecting the jurisdiction of this court to entertain a suit against the defendants as individuals. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.(N.S.) 932, 14 Ann.Cas. 764; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Worcester County Trust Co. v. Long (D.C.) 14 F.Supp. 754, 758.

The defendants' motion to dismiss is denied.