## NATIONAL LABOR RELATIONS BOARD *v.* FRIED-MAN-HARRY MARKS CLOTHING CO.

Nos. 422 and 423. Argued February 11, 1937.—Decided April 12, 1937.

*Messrs. Charles Fahy* and *Charles E. Wyzanski, Jr.,* with whom *Attorney General Cummings, Solicitor General Reed,* and *Messrs. A. H. Feller, Charles A. Horsky, Robert B. Watts, Laurence A. Knapp,* and *A. L. Wirin* were on the brief, for petitioner.*

---

*Arguments in this case are summarized from the briefs. Extracts from the oral arguments in this and other Labor Act cases will appear in an appendix in the bound volume.

60

*Mr. Leonard Weinberg,* with whom *Mr. Harry J. Green* was on the brief, for respondent.

64

66

68

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The National Labor Relations Board, by its orders of March 28, 1936, required the respondent, Friedman-Harry Marks Clothing Company, Inc., to cease and desist from discharging any of its employees or otherwise discriminating in regard to the tenure and conditions of their employment, and from threatening such action, for the reason that such employees have joined or assisted the Amalgamated Clothing Workers of America or otherwise engaged in union activity; from maintaining surveillance

of the activities of the labor organization and of their employees in connection therewith; and from interfering in any manner with, or coercing, its employees in the exercise of their right to self-organization and representation for the purpose of collective bargaining or other mutual aid or protection as guaranteed in § 7 of the National Labor Relations Act. The orders also required respondent to offer reinstatement to certain discharged employees, to make good their loss of pay, and to post notices for thirty days that respondent would cease and desist from the practices restrained by the orders. The Circuit Court of Appeals refused to enforce the orders, 85 F. (2d) 1, and this Court granted certiorari.

The proceeding was initiated by the National Labor Relations Board upon charges that the respondent had discharged certain employees because they had engaged in union activities. The Board issued two complaints alleging unfair labor practices within the meaning of the National Labor Relations Act. Notice of hearing was given. Respondent appeared specially and moved to dismiss the complaints upon the grounds that the Act, and the proceedings before the Board, were in contravention of Articles I and III and the First, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Amendments of the Constitution of the United States. Reserving these objections, respondent filed answers denying all the allegations of the complaints except that respondent is a Virginia corporation engaged in the business of manufacturing men's clothing in Richmond. The Board overruled the objections to its jurisdiction and the validity of the Act. For the purpose of presenting the constitutional questions, and to expedite the proceedings, counsel for respondent announced at the beginning of the hearings "that he would not cross-examine any of the Board's witnesses and would not offer any countervailing evi-

dence." The Board received evidence and made its findings. There were numerous objections by respondent to the competency and relevancy of certain testimony.

The Board found: Respondent, a Virginia corporation, has its plant at Richmond, where it is engaged in the purchase of raw materials and the manufacture, sale and distribution of men's clothing. The principal materials are woolen and worsted goods. 99.57 per cent. of these goods come from States other than Virginia, 75 per cent. being purchased in New York and fabricated for the most part in other States. Cotton linings come from several southern States. Particulars as to the sources of other materials are set forth. Of the garments manufactured by respondent, 82.8 per cent. are purchased by customers outside the State, mainly by department stores and men's clothing stores in the larger cities throughout the country. Respondent maintains a sales office and showroom in New York City through which 15 or 20 per cent. of the total sales are made. Orders are sent to the Richmond plant, the goods being sold f.o.b. Richmond. In 1932, the volume of respondent's business amounted to $800,000 and 80,000 units, increasing to $1,750,000 and 150,000 units in the first ten months of 1935.

The Board made elaborate findings with respect to the clothing manufacturing industry and its relation to interstate commerce. Among these findings are the following: The men's clothing industry is among the twenty most important manufacturing industries in this country. Fifty per cent. of the manufacturing establishments are in the State of New York; most of the remainder are in Pennsylvania, Maryland, New Jersey, Illinois, Massachusetts, California and Ohio. Since the men's wear fabrics are produced largely in the New England States, the goods must be transported from the mills across state lines to the fabricating establishments in the States above

mentioned. The manufactured clothing is sold throughout the nation, only about 48 per cent. of the total sales being made in the seven States which produce about 90 per cent. of the total men's clothing. The findings describe the methods of sales, the New York market being the largest in the country. The Board concluded: "The men's clothing industry is thus an industry which is nearly entirely dependent in its operations upon purchases and sales in interstate commerce and upon interstate transportation. There is a constant flow of raw wool from the western States and foreign countries to the mills of New England where it is transformed into men's wear fabrics, thence to the sponging and shrinking plants of New York and Philadelphia, then, joined by the other necessary raw materials, to the fabricating factories of the Middle Atlantic States for manufacture into clothing. . . . The industry itself has no doubt as to its status, for the Executive Director of the New York Clothing Manufacturers Exchange, Inc., which represents about 250 manufacturers doing 70 per cent. of the total business in the New York market, stated in his affidavit that the industry is conducted as an interstate business and is entirely dependent upon interstate commerce."

The Board also made findings in relation to the labor organization here involved. The Board found: "The Amalgamated Clothing Workers of America is a labor organization composed of over 125,000 men and women employed in the men's and boys' clothing industry. . . . The period before the recognition by the employers of the Amalgamated was marked by long and bitter strikes. In 1921 there had been a general strike in New York City which had lasted for eight months and caused losses of millions of dollars to employers and employees. A similar general strike in New York in 1924 lasted for six weeks and involved all of the 500 firms in that area and their

35,000 workers. The wage loss to the workers was nearly $6,000,000, the financial loss to the manufacturers ran into the millions. . . . This costly industrial strife resulted finally in recognition of the Amalgamated by the employers. . . . The New York strike of 1924 was ended by the establishment of a collective agreement between the leading manufacturers and the Amalgamated which was soon joined in by other manufacturers in that area. Factories in Rochester, Baltimore, Boston, Cincinnati, Cleveland, St. Louis and Philadelphia recognized the union and entered into agreements with it. Today the Amalgamated has collective agreements with clothing manufacturers and contractors employing the greater number of the clothing workers in the United States. These collective agreements have brought peace to that portion of the industry that has entered such agreements. . . . Since the signing of the collective agreement for the New York area, the New York Clothing Manufacturers Exchange, Inc. and the Amalgamated have handled jointly a total of 21,193 complaints and disputes. In only 898 of these cases, or slightly over 4 per cent., was a resort to arbitration required because of inability to agree. Of these 898, 30 per cent. were settled by the impartial chairman acting as a mediator; in the remainder he sat as an arbitrator and rendered a decision. . . . The President of the New York Clothing Manufacturers Exchange, Inc. . . . has stated that the 'organization of collective bargaining machinery, the establishment of an impartial tribunal, and the founding of unemployment insurance are the outstanding achievements' in the industry and that the Amalgamated Clothing Workers 'has been perhaps the largest single contributing factor to the lasting peace and harmony that have characterized those clothing markets where the Amalgamated Clothing Workers of America was the other contracting party to the collective agreement.'"

With respect to unfair labor practices, the Board found that in the summer of 1935 employees of respondent had formed a local union of the Amalgamated Clothing Workers of America and were soliciting membership therein. Respondent's management "at once indicated hostility to the union organization of its employees and declared that it would not permit them to join the Amalgamated." Statements of the president of the respondent showing his antagonism to the union were quoted by the Board. At one time he stated to a group of employees that he would discharge every one that attended the union meeting. Similar statements were made by respondent's secretary. Respondent's management "has maintained surveillance over union meetings and activities." The findings set forth the circumstances of the discharge of employees. The Board concluded that these discharges were because of the membership of the employees in the labor organization and their activities in connection with it. The Board also found that interference in the industry with the activities of employees in joining and assisting labor organizations and the refusal to accept the procedure of collective bargaining had led and tends to lead to strikes and other labor disputes that burden and obstruct commerce.

The findings of the Board both as to the nature of respondent's business and the circumstances of the discharge of its employees are supported by the evidence.

For the reasons stated in our opinion in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., ante,* p. 1, we hold that the objections raised by respondent to the construction and validity of the National Labor Relations Act are without merit. The decrees of the Circuit Court of Appeals are reversed and the causes are remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE MCREYNOLDS delivered the following dissenting opinion in the cases preceding:

MR. JUSTICE VAN DEVANTER, MR. JUSTICE SUTHER-LAND, MR. JUSTICE BUTLER and I are unable to agree with the decisions just announced.

We conclude that these causes were rightly decided by the three Circuit Courts of Appeals and that their judgments should be affirmed. The opinions there given without dissent are terse, well-considered and sound. They disclose the meaning ascribed by experienced judges to what this Court has often declared, and are set out below in full.

Considering the far-reaching import of these decisions, the departure from what we understand has been consistently ruled here, and the extraordinary power confirmed to a Board of three,[1] the obligation to present our views becomes plain.

The Court, as we think, departs from well-established principles followed in *Schechter Corp.* v. *United States*, 295 U. S. 495 (May, 1935) and *Carter* v. *Carter Coal Co.*, 298 U. S. 238 (May, 1936). Upon the authority of those decisions, the Circuit Courts of Appeals of the Fifth, Sixth and Second Circuits in the causes now before us have held the power of Congress under the commerce clause does not extend to relations between employers and their employees engaged in manufacture, and therefore the Act conferred upon the National Labor Relations Board no authority in respect of matters covered by the questioned orders. In *Foster Bros. Mfg. Co.* v. *National Labor Relations Board*, 85 F. (2d) 984, the Circuit Court of Appeals, Fourth Circuit, held the Act inapplicable to manufacture and expressed the view that if so extended it

---

[1] National Labor Relations Act (Act of July 5, 1935, c. 372, 49 Stat. 449; U. S. C., Sup. I, Tit. 29, §§ 151 *et seq.*).

would be invalid. Six district courts, on the authority of *Schechter's* and *Carter's* cases, have held that the Board has no authority to regulate relations between employers and employees engaged in local production.[a] No decision or judicial opinion to the contrary has been cited, and we find none. Every consideration brought forward to uphold the Act before us was applicable to support the Acts held unconstitutional in causes decided within two years. And the lower courts rightly deemed them controlling.

By its terms the Labor Act extends to employers— large and small—unless excluded by definition,[2] and declares that if one of these interferes with, restrains, or coerces any employee regarding his labor affiliations, etc., this shall be regarded as unfair labor practice. And a "labor organization" means any organization of any kind or any agency or employee representation committee or plan which exists for the purpose in whole or in part of dealing with employers concerning grievances, labor dis-

---

[a] *Stout* v. *Pratt*, 12 F. Supp. 864. *Bendix Products Corp.* v. *Beman*, 14 F. Supp. 58. *Eagle-Picher Lead Co.* v. *Madden*, 15 F. Supp. 407. *Bethlehem Shipbuilding Corp.* v. *Meyers*, 15 F. Supp. 915. *El Paso Electric Co.* v. *Elliott*, 15 F. Supp. 81. *Oberman & Co.* v. *Pratt*, 16 F. Supp. 887.

[2] SEC. 2. (2) The term "employer" includes any person acting in the interest of an employer, directly or indirectly, but shall not include the United States, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

SEC. 2. (3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent

putes, wages, rates of pay, hours of employment or conditions of work.[b]

The three respondents happen to be manufacturing concerns—one large, two relatively small. The Act is now applied to each upon grounds common to all. Obviously what is determined as to these concerns may gravely affect a multitude of employers who engage in a great variety of private enterprises—mercantile, manufacturing, publishing, stock-raising, mining, etc. It puts into the hands of a Board power of control over purely local industry beyond anything heretofore deemed permissible.

---

employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse.

SEC. 7. Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

[b] SEC. 2. (5) The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

SEC. 3. (a) There is hereby created a board, to be known as the "National Labor Relations Board" (hereinafter referred to as the "Board"), which shall be composed of three members, who shall be appointed by the President, by and with the advice and consent of the Senate. One of the original members shall be appointed for a term of one year, one for a term of three years, and one for a term of five years, but their successors shall be appointed for terms of five years each, except that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed. The President shall designate one member to serve as chairman of the Board. Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.

## II.

[No. 419] Circuit Court of Appeals (Fifth Circuit)
Opinion June 15, 1936, 83 F. (2d) 998
Before Foster, Sibley, and Hutcheson, Circuit Judges

*"Per Curiam.* The National Labor Relations Board has petitioned us to enforce an order made by it, which requires Jones & Laughlin Steel Corporation, organized under the laws of Pennsylvania, to reinstate certain discharged employees in its steel plant in Aliquippa, Pa., and to do other things in that connection.

"The petition must be denied, because, under the facts found by the Board and shown by the evidence, the Board has no jurisdiction over a labor dispute between employer and employees touching the discharge of laborers in a steel plant who were engaged only in manufacture. The Constitution does not vest in the Federal Government the power to regulate the relation as such of employer and employee in production or manufacture.

" 'One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has engaged in two distinct and separate activities. So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In respect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. Utah Power & L. Co. v. Pfost, 286 U. S. 165, 182. Production is not commerce but a step in preparation for commerce. Chassaniol v. Greenwood, 291 U. S. 584–587.

" 'We have seen that the word "commerce" is the equivalent of the phrase "intercourse for the purposes of trade."

80

Plainly the incidents leading up to and culminating in the mining of coal do not constitute such intercourse. The employment of men, the fixing of their wages, hours of labor and working conditions, the bargaining in respect of these things—whether carried on separately or collectively—each and all constitute intercourse for the purposes of production, not of trade. The latter is a thing apart from the relation of employer and employee, which in all producing occupations is purely local in character. Extraction of coal from the mine is the aim and the completed result of local activities. Commerce in the coal mined is not brought into being by force of these activities but by negotiations, agreements, and circumstances entirely apart from production. Mining brings the subject matter of commerce into existence. Commerce disposes of it.' Carter v. Carter Coal Co., 298 U. S. 238, decided May 18, 1936.

"That the employer has a very large business, the interruption of which by a strike of employees which might happen, and that in consequence of such strike production might be stopped and interstate commerce in the products affected, does not make the regulation of the relation justified under the commerce power of Congress, because the possible effect on interstate commerce is too remote to warrant Federal invasion of the State's right to regulate the employer-employee relation. Nor is it important that the employer imports part of his raw materials in interstate commerce and sells and exports a large part of his product in interstate commerce, which imports and exports would possibly be stopped by a possible strike. The employers' entire business thus connected together does not, as respects Federal power, make a case different from that in which importation of materials, manufacture of them, and sale and export of the product are conducted by three persons. The employer here by doing

all three things does not alter the respective constitutional spheres of the Federal and State governments. The making and fabrication of steel by Jones & Laughlin Steel Corporation is production regulable by the State of Pennsylvania, notwithstanding the corporation also engages in interstate commerce regulable by Congress in bringing in its raw materials and again in selling and delivering its products. No specific present intent appears to impede or destroy interstate commerce by means of a strike in a manufacturing plant, or other like direct obstruction to or burden on interstate commerce. The order we are asked to enforce is not shown to be one authorized to be made under the authority of Congress. Carter v. Carter Coal Co., supra.

"The petition is denied."

### III.

[Nos. 420-421] Circuit Court of Appeals (Sixth Circuit)
Opinion June 30, 1936, 85 F. (2d) 391
Before Moorman, Hicks, and Simons, Circuit Judges.

*"Per Curiam.* The National Labor Relations Board has filed a petition in this court to enforce an order issued by it in proceedings which it instituted against the Fruehauf Trailer Company. The order directs the Trailer Company to cease and desist from discharging or threatening to discharge any of its employees because of their activities in connection with the United Automobile Workers Federal Labor Union No. 19,375, to cease discouraging its employees from becoming members of that union, to offer to certain of its former employees immediate and full reinstatement in their former positions without prejudice to their seniority rights, to make such employees whole for any losses of pay that they have suffered by reason of their discharge by paying

them what they would have earned as wages from the dates of their discharges, and to post notices throughout its Detroit plant, in conspicuous places, stating that it has ceased and desisted from discharging or threatening to discharge its employees for joining the United Automobile Workers Federal Labor Union No. 19,375. The Fruehauf Trailer Company has filed its petition seeking a review of the order and praying that the court set it aside. The record of the proceeding before the Labor Board has been filed and the two petitions have been heard together in this court.

"The Fruehauf Trailer Company is a corporation organized and existing under the laws of the State of Michigan and is engaged in the manufacture, assembly, and sale of automobile trailers at its plant in Detroit, Mich. The material and parts used in the manufacture and production of the trailers are shipped to the plant. After the trailers are manufactured, many of them are shipped to other states for sale and use. The order in question undertakes to regulate and control the Trailer Company's relations and dealings with its employees engaged in the production and manufacture of trailers at the company's plant in Detroit and does not directly affect any of the activities of the Trailer Company in the purchasing and transporting to its plant of materials and parts for the manufacture and production of trailers or in the shipping or selling of such trailers after they are manufactured. It was issued under the authority of the Act of Congress of July 5, 1935, known as the National Labor Relations Act. (29 U. S. C. A., § 151 et seq.) The authority for the Act is claimed under the commerce clause of the Constitution. Since the order is directed to the control and regulation of the relations between the Trailer Company and its employees in respect to their activities in the manufacture and production of

trailers and does not directly affect any phase of any interstate commerce in which the Trailer Company may be engaged, and since, under the ruling of Carter v. Carter Coal Company, 298 U. S. 238, the Congress has no authority or power to regulate · or control such relations between the Trailer Company and its employees, the National Labor Relations Board was without authority to issue the order. See National Labor Relations Board v. Jones & Laughlin Steel Corporation, 83 F. (2d) 998 (C. C. A. 5), decided June 15, 1936.

"The petition of the Board is accordingly dismissed and the order is set aside."

## IV.

[Nos. 422-423] Circuit Court of Appeals (Second Circuit)
Opinion July 13, 1936, 85 F. (2d) 1
Before Manton, Swan, and A. N. Hand, Circuit Judges.

"*Per Curiam.* The respondent, a Virginia corporation, is a manufacturer of men's clothing with its principal office and its factory in Richmond, Va. Practically all the raw materials used are brought from other states down into Virginia where respondent manufactures them into men's clothing. About 83% of the manufactured products are sold f.o.b. Richmond, to customers located in states other than Virginia.

"Two sets of charges were filed with petitioner's local Regional Director by the Amalgamated Clothing Workers of America, a labor union of workers in the men's clothing industry, in which it was alleged that the respondent violated the National Labor Relations Act (29 U. S. C. A., § 151 et seq.) by discharging from its employ and discriminating against, 29 out of 800 of its employees, because they had engaged in union activities. The Board filed complaint under § 10 (b) of the Act (29 U. S. C. A.,

84

§ 160 (b)) and after a hearing respondent was found to have violated the Act and was ordered to cease and desist from the unfair labor practices.

"Petitioner's theory is that the respondent is engaged in interstate commerce because of the shipment of raw materials to it from other states and the shipment of its finished products to other states, and, in addition, that the flow of commerce doctrine, as exemplified in Swift & Co. v. United States, 196 U. S. 375, brings this manufacturer within the federal power to regulate commerce. Respondent contends that the National Labor Relations Act as applied to it, is unconstitutional and therefore invalid and that the attempt to enforce its provisions against it is illegal.

"It is shown that the alleged unfair labor practices complained of occurred in the manufacture of clothing in Richmond, Va. None of the workers involved had to do with the transportation of the clothing after its manufacture. They were engaged in various operations in the Richmond factory.

"The relations between the employer and its employees in this manufacturing industry were merely incidents of production. In its manufacturing, respondent was in no way engaged in interstate commerce, nor did its labor practices so directly affect interstate commerce as to come within the federal commerce power. Carter v. Carter Coal Co., 298 U. S. 238; Schechter Poultry Corp. v. United States, 295 U. S. 495. No authority warrants the conclusion that the powers of the Federal Government permit the regulation of the dealings between employers or employees when engaged in the purely local business of manufacture.

"Therefore the orders to cease and desist may not be enforced.

"Petitions denied."

## V.

In each cause the Labor Board formulated and then sustained a charge of unfair labor practices towards persons employed only in production. It ordered restoration of discharged employees to former positions with payment for losses sustained. These orders were declared invalid below upon the ground that respondents while carrying on production operations were not thereby engaging in interstate commerce; that labor practices in the course of such operations did not directly affect interstate commerce; consequently respondents' actions did not come within Congressional power.

Respondent in No. 419 is a large, integrated manufacturer of iron and steel products—the fourth largest in the United States. It has two production plants in Pennsylvania where raw materials brought from points outside the state are converted into finished products, which are thereafter distributed in interstate commerce throughout many states. The Corporation has assets amounting to $180,000,000, gross income $47,000,000, and employs 22,000 people—10,000 in the Aliquippa plant where the complaining employees worked. So far as they relate to essential principles presently important, the activities of this Corporation, while large, do not differ materially from those of the other respondents and very many small producers and distributors. It has attained great size; occupies an important place in business; owns and operates mines of ore, coal, and lime-stone outside Pennsylvania, the output of which, with other raw material, moves to the production plants. At the plants this movement ends. Having come to rest this material remains in warehouses, storage yards, etc., often for months, until the process of manufacture begins. After this has been completed, the finished products go into interstate commerce. The discharged employees labored only in the manufac-

turing department. They took no part in the transportation to or away from the plant; nor did they participate in any activity which preceded or followed manufacture.

Our concern is with those activities which are common to the three enterprises. Such circumstances as are merely fortuitous—size, character of products, etc.—may be put on one side. The wide sweep of the statute will more readily appear if consideration be given to the Board's proceedings against the smallest and relatively least important—the Clothing Company. If the Act applies to the relations of that Company to employees in production, of course it applies to the larger respondents with like business elements although the affairs of the latter may present other characteristics. Though differing in some respects, all respondents procure raw materials outside the state where they manufacture, fabricate within and then ship beyond the state.

In Nos. 420-21 the respondent, Michigan corporation, manufactures commercial trailers for automobiles from raw materials brought from outside that state, and thereafter sells these in many states. It has a single manufacturing plant at Detroit and annual receipts around $3,000,000; 900 people are employed.

In Nos. 422-23 the respondent is a Virginia corporation engaged in manufacturing and distributing men's clothing. It has a single plant and chief office at Richmond, annual business amounting perhaps to $2,000,000, employs 800, brings in almost all raw material from other states and ships the output in interstate commerce. There are some 3,300 similar plants for manufacturing clothing in the United States, which together employ 150,000 persons and annually put out products worth $800,000,000.

## VI.

The Clothing Company is a typical small manufacturing concern which produces less than one-half of one per cent of the men's clothing produced in the United States and employs 800 of the 150,000 workmen engaged therein. If closed today, the ultimate effect on commerce in clothing obviously would be negligible. It stands alone, is not seeking to acquire a monopoly or to restrain trade. There is no evidence of a strike by its employees at any time or that one is now threatened, and nothing to indicate the probable result if one should occur.

Some account of the Labor Board's proceedings against this Company will indicate the ambit of the Act as presently construed.

September 28, 1935, the Amalgamated Clothing Workers of America, purporting to act under § 10 (b) of the National Relations Act,[3] filed with the Board a

---

[3] SEC. 10. (b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. In any such proceeding the rules of evidence prevailing in courts of law or equity shall not be controlling.

"Charge" stating that the Clothing Company had engaged in unfair labor practices within the meaning of the Act—§ 8 (1) (3)—in that it had, on stated days in August and September, 1935, unjustifiably discharged, demoted or discriminated against some twenty named members of that union and, in other ways, had restrained, interfered with and coerced employees in the exercise of their right of free choice of representatives for collective bargaining. And further "that said labor practices are unfair labor practices affecting commerce within the meaning of said Act."

This "Charge" contained no description of the Company's business, no word concerning any strike against it past, present or threatened. The number of persons employed or how many of these had joined the union is not disclosed.

Thereupon the Board issued a "Complaint" which recited the particulars of the "Charge," alleged incorporation of the Company in Virginia, and ownership of a plant at Richmond where it is continuously engaged in the "production, sale and distribution of men's clothing"; that material is brought from other states and manufactured into clothing, which is sold and shipped to many states, etc.,—"all of aforesaid constituting a continuous flow of commerce among the several states." Also that while operating the Richmond plant the Clothing Company discharged, demoted, laid off or discriminated against some twenty persons "employed in production at the said plant . . . for the reason that all of the said employees, and each of them, joined and assisted a labor organization known as the Amalgamated Clothing Workers of America, and engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection," etc. Further that the Company circulated among its employees and under-

took to coerce them to sign a writing expressing satisfaction with conditions; induced some members of the union to withdraw; did other similar things, etc.—all of which amounted to unfair labor practices affecting commerce within the meaning of § 8 (1) (3) (4)[4] and § 2 (6) (7)[5] of the Labor Act. "The aforesaid unfair labor practices occur in commerce among the several states, and on the basis of experience in the aforesaid plant and others in the same and other industries, burden and obstruct such commerce and the free flow thereof and have led and tend to lead to labor disputes burdening and obstructing such commerce and the free flow thereof."

The complaint says nothing concerning any strike against the Clothing Company past, present or threatened; there is no allegation concerning the number of persons employed, how many joined the union, or the value of the output.

---

[4] Sec. 8. It shall be an unfair labor practice for an employer—

(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 6 (a), an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act, or in the National Industrial Recovery Act (U. S. C., Supp. VII, title 15, secs. 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein if such labor organization is the representative of the em-

The respondent filed a special appearance objecting to the Board's jurisdiction, which was overruled; also an answer admitting the discharge of certain employees, but otherwise it generally denied the allegations of the "Complaint."

Thereupon the Board demanded access to the Company's private records of accounts, disclosure of the amount of capital invested by its private owners, the names of all of its employees, its payrolls, the amounts and character of all purchases and from whom made, the amounts of sales and to whom made, including the number and kind of units, the number of employees in the plant

---

ployees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made.

(4) To discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act.

(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9 (a).

Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer.

[5] Sec. 2 (6) The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

(7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

during eight years, the names and addresses of the directors and officers of the Company, the names and addresses of its salesmen, the stock ownership of the Company, the affiliation, if any, with other companies, and the former occupations and businesses of its stockholders.

During hearings held at Richmond and Washington, unfettered by rules of evidence, it received a mass of testimony—largely irrelevant. Much related to the character of respondent's business, general methods used in the men's clothing industry, the numbers employed and the general effect of strikes therein. The circumstances attending the discharge or demotion of the specified employees were brought out.

Following this the Board found—

The men's clothing industry of the United States ranks sixteenth in the number of wage earners employed, with more than 3,000 firms and 150,000 workers engaged. The steps in the typical process of manufacture are described. Raw material is brought in from many states, and after fabrication the garments are sold and delivered through canvassers and retailers. "The men's clothing industry is thus an industry which is nearly entirely dependent in its operations upon purchases and sales in interstate commerce and upon interstate transportation."

The Amalgamated Clothing Workers of America is a labor organization composed of over 125,000 men and women employed in making clothing. Members are organized in local unions. Before recognition of this union by employers long and bitter strikes occurred, some of which are described. The union has striven consistently to improve the general economic and social conditions of members. Benefits that flow from recognizing and cooperating with it are realized by manufacturers.

Description is given of the Clothing Company's operations, the sources of its raw material (nearly all outside

Virginia), and/the method used to dispose of its output. Eighty-two per cent is sold to customers beyond Virginia. It is among the fifty largest firms in the industry, and among the ten of that group paying the lowest average wage.

In the summer of 1935 the employees at the Richmond plant formed a local of the Amalgamated Clothing Workers and solicited memberships. The management at once indicated opposition and declared it would not permit employees to join. Hostile acts and the circumstances of the discharge or demotion of complaining employees are described. It is said all were discharged or demoted because of union membership. And further that "Interference by employers in the men's clothing industry with the activities of employees in joining and assisting labor organizations and their refusal to accept the procedure of collective bargaining has led and tends to lead to strikes and other labor disputes that burden and obstruct commerce and the free flow thereof. In those cases where the employees have been permitted to organize freely and the employers have been willing to bargain collectively, strikes and industrial unrest have gradually disappeared, as shown in Finding 19. But where the employer has taken the contrary position, strikes have ensued that have resulted in substantial or total cessation of production in the factories involved and obstruction to and burden upon the flow of raw materials and finished garments in interstate commerce."

The number of employees who joined the union does not appear; the general attitude of employees towards the union or the Company is not disclosed; the terms of employment are not stated—whether at will, by the day or by the month. What the local Chapter was especially seeking at the time we do not know.

It does not appear that, either prior or subsequent to the "Complaint," there has been any strike, disorder or

industrial strife at respondent's factory, or any interference with or stoppage of production or shipment of its merchandise. Nor that alleged unfair labor practices at its plant had materially affected manufacture, sale or distribution; or materially affected, burdened or obstructed the flow of products; or affected, burdened or obstructed the flow of interstate commerce, or tended to do so.

The Board concluded that the Clothing Company had discriminated in respect to tenure and employment and thereby had discouraged membership in the union; that it had interfered with, restrained and coerced its employees in violation of rights guaranteed by § 7 of the National Labor Relations Act; that these acts occurred in the course and conduct of commerce among the states, immediately affect employees engaged in the course and conduct of interstate commerce, and tend to lead to labor disputes burdening and obstructing such commerce and the free flow thereof.

An order followed, March 28, 1936, which commanded immediate reinstatement of eight discharged employees and payment of their losses; also that the Company should cease and desist from discharging or discriminating against employees because of connections with the union, should post notices, etc. On the same day the Board filed a petition asking enforcement of the order in the United States Circuit Court of Appeals (Second Circuit) at New York, which was denied July 13, 1936.

## VII.

The precise question for us to determine is whether in the circumstances disclosed Congress has power to authorize what the Labor Board commanded the respondents to do. Stated otherwise, in the circumstances here existing could Congress by statute direct what the Board has ordered? General disquisitions concerning the en-

actment are of minor, if any, importance. Circumstances not treated as essential to the exercise of power by the Board may, of course, be disregarded. The record in Nos. 422-23—a typical case—plainly presents these essentials and we may properly base further discussion upon the circumstances there disclosed.

A relatively small concern caused raw material to be shipped to its plant at Richmond, Virginia, converted this into clothing, and thereafter shipped the product to points outside the state. A labor union sought members among the employees at the plant and obtained some. The Company's management opposed this effort, and in order to discourage it discharged eight who had become members. The business of the Company is so small that to close its factory would have no direct or material effect upon the volume of interstate commerce in clothing. The number of operatives who joined the union is not disclosed; the wishes of other employees are not shown; probability of a strike is not found.

The argument in support of the Board affirms: "Thus the validity of any specific application of the preventive measures of this Act depends upon whether industrial strife resulting from the practices in the particular enterprise under consideration would be of the character which Federal power could control if it occurred. If strife in that enterprise could be controlled, certainly it could be prevented."

Manifestly that view of Congressional power would extend it into almost every field of human industry. With striking lucidity, fifty years ago, *Kidd* v. *Pearson,* 128 U. S. 1, 21, declared: "If it be held that the term [commerce with foreign nations and among the several states] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in

the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry." This doctrine found full approval in *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, 13; *Schechter Poultry Corp.* v. *United States, supra,* and *Carter* v. *Carter Coal Co., supra,* where the authorities are collected and principles applicable here are discussed.

In *Knight's* case Chief Justice Fuller, speaking for the Court, said: "Doubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary and not the primary sense; and although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it . . . It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the States as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality."

In *Schechter's* case we said: "In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate

commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle . . . But where the effect of intrastate transactions upon interstate commerce is merely indirect, such transactions remain within the domain of state power. If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people and the authority of the State over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the State's commercial facilities would be subject to federal control."

*Carter's* case declared—"Whether the effect of a given activity or condition is direct or indirect is not always easy to determine. The word 'direct' implies that the activity or condition invoked or blamed shall operate proximately—not mediately, remotely, or collaterally— to produce the effect. It connotes the absence of an efficient intervening agency or condition. And the extent of the effect bears no logical relation to its character. The distinction between a direct and an indirect effect turns, not upon the magnitude of either the cause or the effect, but entirely upon the manner in which the effect has been brought about. If the production by one man of a single ton of coal intended for interstate sale and shipment, and actually so sold and shipped, affects interstate commerce indirectly, the effect does not become direct by multiplying the tonnage, or increasing the number of men employed, or adding to the expense or complexities of the business, or by all combined."

Any effect on interstate commerce by the discharge of employees shown here, would be indirect and remote in

the highest degree, as consideration of the facts will show. In No. 419 ten men out of ten thousand were discharged; in the other cases only a few. The immediate effect in the factory may be to create discontent among all those employed and a strike may follow, which, in turn, may result in reducing production, which ultimately may reduce the volume of goods moving in interstate commerce. By this chain of indirect and progressively remote events we finally reach the evil with which it is said the legislation under consideration undertakes to deal. A more remote and indirect interference with interstate commerce or a more definite invasion of the powers reserved to the states is difficult, if not impossible, to imagine.

The Constitution still recognizes the existence of states with indestructible powers; the Tenth Amendment was supposed to put them beyond controversy.

We are told that Congress may protect the "stream of commerce" and that one who buys raw material without the state, manufactures it therein, and ships the output to another state is in that stream. Therefore it is said he may be prevented from doing anything which may interfere with its flow.

This, too, goes beyond the constitutional limitations heretofore enforced. If a man raises cattle and regularly delivers them to a carrier for interstate shipment, may Congress prescribe the conditions under which he may employ or discharge helpers on the ranch? The products of a mine pass daily into interstate commerce; many things are brought to it from other states. Are the owners and the miners within the power of Congress in respect of the miners' tenure and discharge? May a mill owner be prohibited from closing his factory or discontinuing his business because so to do would stop the flow of products to and from his plant in interstate commerce?

May employees in a factory be restrained from quitting work in a body because this will close the factory and thereby stop the flow of commerce? May arson of a factory be made a Federal offense whenever this would interefere with such flow? If the business cannot continue with the existing wage scale, may Congress command a reduction? If the ruling of the Court just announced is adhered to these questions suggest some of the problems certain to arise.

And if this theory of a continuous "stream of commerce" as now defined is correct, will it become the duty of the Federal Government hereafter to suppress every strike which by possibility may cause a blockade in that stream? *In re Debs,* 158 U. S. 564. Moreover, since Congress has intervened, are labor relations between most manufacturers and their employees removed from all control by the state? *Oregon-Washington R. & N. Co.* v. *Washington,* 270 U. S. 87 (1926).

To this argument *Arkadelphia Milling Co.* v. *St. Louis Southwestern R. Co.,* 249 U. S. 134, 150, affords an adequate reply. No such continuous stream is shown by these records as that which counsel assume.

There is no ground on which reasonably to hold that refusal by a manufacturer, whose raw materials come from states other than that of his factory and whose products are regularly carried to other states, to bargain collectively with employees in his manufacturing plant, directly affects interstate commerce. In such business, there is not one but two distinct movements or streams in interstate transportation. The first brings in raw material and there ends. Then follows manufacture, a separate and local activity. Upon completion of this, and not before, the second distinct movement or stream in interstate commerce begins and the products go to other states. Such is the common course for small as well as

large industries. It is unreasonable and unprecedented to say the commerce clause confers upon Congress power to govern relations between employers and employees in these local activities. *Stout* v. *Pratt,* 12 F. Supp. 864. In *Schechter's* case we condemned as unauthorized by the commerce clause assertion of federal power in respect of commodities which had come to rest after interstate transportation. And, in *Carter's* case, we held Congress lacked power to regulate labor relations in respect of commodities before interstate commerce has begun.

It is gravely stated that experience teaches that if an employer discourages membership in "any organization of any kind" "in which employees participate, and which exists for the purpose in whole or in part of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work," discontent may follow and this in turn may lead to a strike, and as the outcome of the strike there may be a block in the stream of interstate commerce. Therefore Congress may inhibit the discharge! Whatever effect any cause of discontent may ultimately have upon commerce is far too indirect to justify Congressional regulation. Almost anything—marriage, birth, death—may in some fashion affect commerce.

## VIII.

That Congress has power by appropriate means, not prohibited by the Constitution, to prevent direct and material interference with the conduct of interstate commerce is settled doctrine. But the interference struck at must be direct and material, not some mere possibility contingent on wholly uncertain events; and there must be no impairment of rights guaranteed. A state by taxation on property may indirectly but seriously affect the cost of transportation; it may not lay a direct tax upon

the receipts from interstate transportation. The first is an indirect effect, the other direct.

This power to protect interstate commerce was invoked in *Standard Oil Co.* v. *United States,* 221 U. S. 1, and *United States* v. *American Tobacco Co.,* 221 U. S. 106. In each of those cases a combination sought to monopolize and restrain interstate commerce through purchase and consequent control of many large competing concerns engaged both in manufacture and interstate commerce. The combination was sufficiently powerful and action by it so persistent that success became a dangerous probability. Here there is no such situation, and the cases are inapplicable in the circumstances. There is no conspiracy to interfere with commerce unless it can be said to exist among the employees who became members of the union. There is a single plant operated by its own management whose only offense, as alleged, was the discharge of a few employees in the production department because they belonged to a union, coming within the broad definition of "labor organization" prescribed by § 2 (5) of the Act. That definition includes any organization in which employees participate and which exists for the purpose in whole or in part of dealing with employers concerning grievances, wages, &c.

Section 13 of the Labor Act provides—"Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike." And yet it is ruled that to discharge an employee in a factory because he is a member of a labor organization (any kind) may create discontent which may lead to a strike and this may cause a block in the "stream of commerce"; consequently the discharge may be inhibited. Thus the Act exempts from its ambit the very evil which counsel insist may result from discontent caused by a discharge of an association member, but permits coercion of a non-member to join one.

The things inhibited by the Labor Act relate to the management of a manufacturing plant—something distinct from commerce and subject to the authority of the state. And this may not be abridged because of some vague possibility of distant interference with commerce.

## IX.

*Texas & New Orleans R. Co.* v. *Brotherhood of Railway & Steamship Clerks,* 281 U. S. 548, is not controlling. There the Court, while considering an act definitely limited to common carriers engaged in interstate transportation over whose affairs Congress admittedly has wide power, declared: "The petitioners invoke the principle declared in *Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1, but these decisions are inapplicable. The Railway Labor Act of 1926 does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them. The statute is not aimed at this right of the employers but at the interference with the right of employees to have representatives of their own choosing. As the carriers subject to the Act have no constitutional right to interfere with the freedom of the employees in making their selections, they cannot complain of the statute on constitutional grounds."

*Adair's* case, *supra,* presented the question—"May Congress make it a criminal offense against the United States—as by the tenth section of the act of 1898 it does—for an agent or officer of an interstate carrier, having full authority in the premises from the carrier, to discharge an employee from service simply because of his membership in a labor organization?" The answer was no. "While, as already suggested, the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law, are subject to such reasonable restraints as the common good or the general welfare may

require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee. It was the legal right of the defendant Adair—however unwise such a course might have been—to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so—however unwise such a course on his part might have been—to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employee have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land." "The provision of the statute under which the defendant was convicted must be held to be repugnant to the Fifth Amendment and as not embraced by nor within the power of Congress to regulate interstate commerce, but under the guise of regulating interstate commerce and as applied to this case it arbitrarily sanctions an illegal invasion of the personal liberty as well as the right of property of the defendant Adair."

*Coppage* v. *Kansas*, following the *Adair* case, held that a state statute, declaring it a misdemeanor to require an

employee to agree not to become a member of a labor organization during the time of his employment, was repugnant to the due process clause of the Fourteenth Amendment.

The right to contract is fundamental and includes the privilege of selecting those with whom one is willing to assume contractual relations. This right is unduly abridged by the Act now upheld. A private owner is deprived of power to manage his own property by freely selecting those to whom his manufacturing operations are to be entrusted. We think this cannot lawfully be done in circumstances like those here disclosed.

It seems clear to us that Congress has transcended the powers granted.

## ASSOCIATED PRESS *v.* NATIONAL LABOR RELATIONS BOARD.