## NATIONAL LABOR RELATIONS BOARD v. FAINBLATT et al. ·
### No. 6490.

Circuit Court of Appeals, Third Circuit.
July 28, 1938.

Rehearing Denied Sept. 8, 1938.

Malcolm F. Halliday, Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Mortimer B. Wolf, and Ruth Weyand, all of Washington, D. C., for petitioner.

Leon Gerofsky and Joseph Halpern, both of Somerville, N. J., for respondents.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District · Judge.

BUFFINGTON, Circuit Judge.

In this case—a petition by the National Labor Relations Board to enforce an order to cease and desist—the initial and decisive question involved is whether under the proofs in the case the respondents are engaged in· interstate commerce.

In that regard the Intermediate Report (Record, page 461) states: "The business of respondents is clearly of an interstate na-

ture." If this statement is correct, the order should be enforced. On the other hand, if the Board has not shown that "the business of the respondents is clearly of an interstate nature", this Court should decline to enforce the proposed order.

· Addressing ourselves to that controverted question, the proofs show that Benjamin Fainblatt, a respondent, is the sole owner of a small garment manufacturing plant in the village of Somerville, New Jersey, employing at times sixty persons, accord-· ing to the manufacturing orders he receives from a partnership in New York called Lee Sportswear Company, which was composed of his sons, and which was engaged in marketing women's sports garments. Their father had no interest in the partnership, and the sons had no interest in the plant or business of their father. The New York Lee Sportswear Company, hereafter called Lee Company, as their business required, owned all the tailoring material here involved. Such material from time to time was cut in New York by Lee Company and shipped in trucks employed by it to respondent's factory,—hereafter called Somerville. At times, in order to avoid delay, Lee Company's material was shipped direct from mills `to Somerville. All shipments were there cut, tailored, pressed by Somerville, and delivered to the trucks employed by Lee Company for delivery either to the New York partnership or its customers as directed by it. To that end Lee Company kept a representative in the factory. The material was owned by Lee Company and respondent had no control, ownership or interest in the material sent by Lee Company or in the tailored article. He was paid for the tailoring work he did, no one but himself was interested in his factory and the profits arising therefrom were included in his personal income tax return. From the testimony produced by the Board, these facts are shown.

Bearing on the fact that respondent had no interest in the Lee Company, respondent's uncontroverted testimony was:

"Q. And you are not financially interested in that company? A. No, sir.

· "Q. Is that a corporation? A. No, sir.

"Q. That, too, is just a business operating under a trade name? A. A partnership.

"Q. I see. You have no financial interest in it? A. No, sir.

"Q. Were you ever associated with that company? A. No, sir."

As to Lee Company paying no bills for or at Somerville, the proof is:

"Q. Well, does the Lee Sportswear Company pay any of the bills of the Somerville Company? A. No.

"Q. Not at all? A. No, no.

\* \* \* \* \* \*

"Q. Did it ever pay for the installation of any of your machinery? A. No, sir.

"Q. Or repairs to your machinery? A. No."

That respondent's work was simply tailoring and cutting, the proof is:

"Q. But what you are actually engaged in here is the tailoring? A. Tailoring and cutting.

"Q. Which is the substantial operation in your plant? A. Tailoring.

\* \* \* \* \* \*

"Q. You went into that business with your own capital? A. Yes.

"Q. You assumed all financial obligations and responsibilities in running this business in Somerville? A. Yes.

"Q. And that is solely a manufacturing business? A. Yes."

That the profits from his plant are reported by respondent and that the Lee Company had no share therein is shown in the Record, page 113:

"Q. Do you file a personal income tax return? A. Yes.

"Q. Do you include in that personal income tax return your income from manufacturing here? A. Yes.

"Q. And does the Lee Sportswear, to your knowledge, include in their income tax return any income from the Somerville Manufacturing Company? A. They haven't got no income from the Somerville Manufacturing Company."

Recognizing these proofs by the witness produced by itself, the Labor Board, in its Intermediate Report, says: "Mr. Fainblatt testified that he is the sole owner of the two companies, and that he has no financial interest in the Lee Sportswear Co."

Moreover, in its report, the Labor Board states: "All of the raw material converted into garments by respondents are owned by the Lee Sportswear Co." As to the operations generally, the Labor Board states:

"All of the raw material, converted into garments by respondents, are owned by the Lee Sportswear Co. Although the proportion varies from time to time, it is customary for the Lee Sportswear Co. to furnish the material already cut and ready for the operators to sew. If the Lee Sportswear Co. is very busy, material is sent to the respondents for cutting. Sometimes, however, the material is shipped directly from the mills to respondents in Somerville, where it is cut. Respondents receive extra compensation for the cutting, whether the uncut material comes from the mills or from Lee Sportswear Co. Some of the mills from which respondents receive these shipments are located outside the state of New Jersey. During recent months most of the material has been cut when received by respondents. After the garments are made up they are shipped back to the Lee Sportswear Co. in New York City, although some of them are turned over to a representative of that company stationed at the Somerville plant, who may ship them directly to customers. Most of the raw materials and finished garments are handled by an expressman or trucking concern, Sissler Brothers, of Somerville, N. J. Lee Sportswear Co. pays the trucking charges. In general no stock of raw materials is maintained at the Somerville plant, although there are times when there is more work on hand than at others.

\* \* \* \* \* \*

"The garments as finished by respondents do not carry any label. Sol Fainblatt, Benjamin Fainblatt's son, is employed by and acts as the Somerville agent of the Lee Sportswear Co. He goes to New York City each morning as a part of his work, gets his orders, returns to Somerville, N. J. about two o'clock in the afternoon, and ships his goods out. The goods that he ships are those turned over to him by respondents. The Lee Sportswear Co. pays in advance for the garments manufactured by respondents. This payment represents principally the labor involved in the cost of manufacture."

In the face of these proofs, given by its own witness and without any proof to the contrary, the Board (Record page 470) made this contradictory and unwarranted finding: "The respondents are doing business in Somerville, New Jersey, under the firm names, Somerville Manufacturing Company and Somerset Manufacturing Company, and are engaged in the manufacture, sale and distribution of Women's sportswear. In the course of this business they have caused substantial amounts of

raw material and finished goods to be purchased, transported and sold in interstate commerce."

On the contrary, the proofs adduced by the Board show that the respondents have made no purchases of "raw material", have made no purchases of "finished product", have sold no goods or materials, and have transported nothing. That the Lee Company, which is not here involved, in the purchase of its raw materials or in its sale of the tailored product, in its transportation to and fro across state lines, was engaged in interstate commerce, in no way affects the respondent, who owns no material, who is not engaged in commerce, who has no commerce to transport, who buys nothing and sells nothing, and who has no voice, power, interest or control in or of what is done by Lee Company in bringing to or taking from his factory its own merchandise. That such an one and his local plant can be drawn into the network of national control under the constitutional power to "regulate the commerce between the states", this court cannot hold.

So regarding, the petition of the Board is denied.

BIGGS, Circuit Judge (dissenting).

There is no dispute as to the essential circumstances of the case at bar, though discrepancies occur in the testimony. The question presented is really one of law. The facts may be stated briefly as follows:

In August, 1934, Benjamin Fainblatt, acting in co-operation with his daughter, Marjorie, established a business in Somerville, New Jersey, under two names procured under the "Business Names Act" of New Jersey.[1] One name was "Somerville Manufacturing Company"; the other was "Somerset Manufacturing Company". The two names were used interchangeably. The individuals principally concerned in the business were the respondents, Benjamin Fainblatt and Marjorie Fainblatt. The name "Somerville Manufacturing Company" was not made use of by the respondents after February 15, 1935, and following that date all business was conducted under the name "Somerset Manufacturing Company".

The business had been financed by Lee Sportswear Company, a co-partnership doing business in New York City and consisting of Leo and Irving Fainblatt, sons of Benjamin Fainblatt, and Marjorie Fainblatt. Benjamin Fainblatt had been employed by this partnership immediately prior to his going into business in Somerville. The business at Somerville consisted of finishing and tailoring women's sportswear. The materials which were finished or tailored were supplied by Lee Sportswear Company and shipped to the respondents' plant at Somerville. When finished and tailored by the respondents, the finished and tailored goods were delivered by the respondents upon the premises to Sol Fainblatt, another son of Benjamin Fainblatt, acting as the representative for Lee Sportswear. Sol Fainblatt directed the disposal of the finished merchandise. Part of it, by his direction, was delivered to Lee Sportswear in New York City; the remainder was sent direct from the Somerville plant to customers of Lee Sportswear in various States. Title to the goods remained in Lee Sportswear and was never vested in the respondents.

The respondents are engaged solely in finishing the material supplied to them by Lee Sportswear. Lee Sportswear supplied unfinished material solely to the respondents. All finished material sold by Lee Sportswear was finished by the respondent. The work performed by them for Lee Sportswear was performed under contracts. The payments made under these contracts were the only source of income to the respondents' business at Somerville. As a matter of fact the records of Lee Sportswear as to unfinished goods delivered to and finished goods received from the respondents, constitute the only production records of the Somerville business.

Somerville Manufacturing Company, Somerset Manufacturing Company employed women garment workers to finish the raw materials furnished by Lee Sportswear. These garment workers constituted the tailoring department of the respondents' business. Beginning about August 14, 1935, at the request of certain employees, attempts were made to organize the employees of the tailoring department of Somerset Manufacturing Company by Local 149 of the International Ladies' Garment Workers' Union. The tailoring department consisted of operators, floor girls and finishers, and was an appropriate bargaining unit. A labor dispute immediately ensued. On Septem-

---

[1] 3 C.S.1910, p. 3686, Supp.1924, p. 2528.

ber 6, 1935, the respondents refused to bargain collectively with the representative of the Union and a strike was precipitated by this refusal.

Between August 14, and September 18, 1935, eight girls were discharged because of their union activity or membership. It would be difficult to find testimony indicating more plainly discrimination against employees for union activity. For example, one of the discharged employees when discharged was told by her foreman, "I am sorry. You are causing too much trouble. I have no more work for you." Another was told by the foreman: "I have not any more work for you. You are causing too much trouble. If you want work go to the Union. The Union will give you work." Another employee was refused admittance to the plant by Benjamin Fainblatt himself, Fainblatt saying, "I have no work for you. * * * I don't owe you anything. If you want work you can go to the Union."

Setting out more fully the testimony in this regard which I have now recapitulated briefly, the Board found that the tailoring department of the Somerset Manufacturing Company constituted an appropriate bargaining unit, that Local No. 149 had been designated by a majority of the employees in the tailoring department as their representative for collective bargaining; that the strike resulted directly from the respondents' refusal to bargain collectively and that the respondent, Benjamin Fainblatt, was guilty of discriminatory discharges and other unfair labor practices prohibited by Section 8 of the Act (29 U.S.C.A. § 158). These findings of the Board are fully supported by the evidence and may not be set aside by this court. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 3 Cir., 91 F.2d 178, affirmed 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Washington, Virginia & Maryland Coach Co., 4 Cir., 85 F.2d 990, affirmed 301 U.S. 142, 57

S.Ct. 648, 81 L.Ed. 965; National Labor Relations Board v. Associated Press, 2 Cir., 85 F.2d 56, affirmed 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. ——.

The Board also made findings in respect to the status of the respondents in interstate commerce. These contain the gist of the controversy at issue and include findings to the effect that the cut cloth processed in the respondents' plant and the finished product thus created were transported in interstate commerce and constituted a continuous flow of commerce among the States, that the volume of this flow varied directly with the volume of the respondents' output and that the acts of the respondents " * * * have led and tend to lead to labor disputes burdening and obstructing commerce * * * between the several States * * *". There is also a specific finding by the Board as to the diminution of the number of finished garments shipped from the respondents' plant during the period of the strike.[2]

Upon June 3, 1936, the Board entered an order to the effect that Benjamin Fainblatt and Marjorie Fainblatt, doing business under the firm names and styles of Somerville Manufacturing Company and Somerset Manufacturing Company, should cease and desist from 1(a), interfering with, restraining or coercing their employees in the exercise of the right to join and assist the International Ladies' Garment Workers' Union or any other labor organization, (b), from discouraging membership in the Union referred to, or any other labor organization, by discharging, refusing to reinstate or otherwise discriminating in regard to tenure or terms of employment in respect to employees who have joined or assisted the Union or any other labor organization, (c), from refusing to bargain collectively with the Union as the exclu-

2 "29. Between September 1 and 17, 1934, approximately 1065 dozen finished garments were shipped from the respondent's plant. From September 18 to 30, 1934, approximately 987 dozen garments were shipped. Though the record is incomplete as to the shipments in October, 1934, it is clear that at least 1011 dozen were shipped. The shipments from September 1 to 17, 1935, totaled approximately 857 dozen. The strike in this case began on September 18, 1935. The shipments from September 18 to 30, 1935, totaled approximately 373 dozen. In October, 1935, the record reveals that there were at least 680 dozen shipped, although there may have been more. Thus, while in September, 1935, before the strike, the plant's output was about 80 per cent of the figure for the same period in 1934; after the strike its output dropped to less than 38 per cent of that during the same period in 1934. Though the record is not clear, it seems probable that the former level of production was not regained during October."

sive representative of the employees in the tailoring department of the Somerset Manufacturing Company; and 2 (a), should bargain collectively with the Union as the exclusive representative of the employees of the tailoring department in respect to rates of pay, wages, hours and other conditions of employment, (b), should offer to the eight discharged employees immediate and full reinstatement to their former positions without prejudice, (c), should offer employment to all employees of the tailoring department who went on strike, subject to certain specified conditions, (d), should make whole the eight discharged employees for any loss of pay, and (e), should post notices in conspicuous places in the plant to the effect that the respondents would cease and desist from the practices condemned by the National Labor Relations Act.

Upon June 19, 1937, the respondents not complying with the order, the Board filed a petition in this court to the end that the order might be enforced. The respondents, having refused to take testimony at the time of the original hearings because they deemed the Act to be unconstitutional, then petitioned this court to the end that supplementary hearings should be held to give them an opportunity to introduce testimony upon their own behalf. This court ordered such hearings and after they were completed the Board filed a further decision and order. In this decision, the Board found that Benjamin Fainblatt was the real owner of the business and that Marjorie Fainblatt was merely a record owner. It also found that the number of permanent employees of the plant had increased between the times of the original and supplementary hearings from fifty-nine to approximately two hundred, and that it had before it no sufficient evidence as to the membership of the Union. In view of these circumstances the Board amended its original order by striking out that portion of it requiring the respondents to bargain collectively, viz., 1 (c) and 2 (a), supra. The supplemental order reiterated all other provisions of the original order. Such was the state of the record at the time of the hearing before us.

The majority opinion of the court poses and answers one question: Is the business of the respondents interstate in character? The answer is given in the negative. I think the question should be framed otherwise, as follows: Are the operations of the respondents a part of a continuous flow of commerce between the States and have the acts of the respondents complained of led and do they tend to lead to a labor dispute burdening and obstructing commerce and the free flow of goods in commerce between the States? I think that the answer to this question must be in the affirmative and for that reason I dissent respectfully from the majority view.

Material shipped through interstate commerce comes into the respondents' plant at Somerville, is there turned into a finished product and goes out again into the currents of interstate commerce. Can the work performed by the respondents' employees be isolated from the stream of commerce whence the unfinished material comes and into which the completed product goes? Can the stream of commerce be impounded temporarily so that for the time being it loses its identity and force and ceases to exist as part of the current between the States?

If the flow of commerce may be so impounded, I see no reason why the interruption may not be created by the devices employed in the case at bar; namely, manufacture on contract, retention of title by him who supplies the raw material and sells the finished goods, and an arbitrary separation of the manufacturing unit from the supply unit and the marketing unit. If the authority of Congress over the flow of commerce between the States may be circumvented by the device of passing raw material through one door of a manufacturing plant and withdrawing the completed product through another, the express purpose of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the protection of commerce from the burden of labor disputes, is frustrated. I believe that such is not the law.

The work performed by the respondents and their employees had a direct causal relationship to the flow of interstate commerce. The labor practices of the respondents precipitated a strike which was the proximate cause of a diminution in interstate commerce. The flow of commerce was thereby obstructed and burdened. In my opinion, such is the test.

The decision of the Supreme Court in National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A. L.R. 1352, may be distinguished from the case at bar only upon the ground that the Clothing Company was not a "contract" manufacturer, that it procured its own raw

materials and itself sold its finished products in interstate commerce. For the reasons heretofore given such a distinction seems to me to have little weight. The Clothing Company Case in reality turns upon the existence of obstruction to commerce or the free flow of commerce, a burden affecting commerce, as in the case at bar. As was stated by the Chief Justice in the case of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 31, 32, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L. R. 1352, "It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power. * * * It is the effect upon commerce, not the source of the injury, which is the criterion."

Nor do I think the case at bar can turn upon the comparatively small size of the respondents' business. The mere size of the operation by which goods are put into interstate commerce does not supply the test. National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509; Renown Stove Co. v. National Labor Relations Board, 6 Cir., 90 F.2d 1017.

In my opinion the order of the Board should be enforced.